

FILED

ORIGINAL

2019 JAN -9 PM 2:46

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:

PAID

JAN _ 9 2019

Clerk, US District Court,
COURT 4612

LACV1900197
GW-MRW

1 | Jonathan VanLoan
2 | In Propria Persona
  | 902 North 4th Avenue
3 | Tucson, AZ 85705
  | 424.280.6807
4 | 9thcircuitplaintiff@gmail.com
5
6
7
8

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

9

10  Jonathan VanLoan,

                    Plaintiff,

11     v.

12  The Nation of Islam, Louis Farrakhan, Tony          ) CIVIL ACTION NO.:
13  Muhammad, The City of Torrance, CA, Eve             ) THREE-JUDGE COURT
    Irvine, Tyrone Gribben, Brian McGee, Patrick        ) COMPLAINT FOR DAMAGES
14  Sullivan, Patrick Furey, George Chen, Tim           ) CIVIL RIGHTS: 42 U.S.C. 1983
    Goodrich, Mike Griffiths, Milton Herring,           ) COMMON LAW TORTS
15  Aurelio Mattucci, Geoff Rizzo, Providence           ) JURY TRIAL DEMANDED
16  Health & Services, Rodney F. Hochman, Garry         ) INJUNCTIVE RELIEF
17  Olney, Richard Glimp, The City of Culver City,      )
    CA, Thomas Small, Meghan Sahli-Wells, Goran         )
18  Erikkson, Scott Bixby, Ryan Thompson,               )
19  Michael VanHook, Steven Armenta, James              )
    Gladden, Sean Fowler, Michael Klepin, Mir           )
20  Nawaz Karim, Jason Driver, Southern California      )
21  Hospital, Prospect Medical Holdings, Inc.,          )
    Samuel Lee, Leonard Green & Partners, Lisa          )
22  Kahn, Marat Shpolyansky, The City of Santa          )
23  Monica, CA, Kenneth Semko, Gleam Davis,             )
    Terry O'Day, Tony Vazquez, Kevin McKeown,           )
24  Sue Himmelrich, Ted Winterer, American Youth        )
25  Hostels, Inc., Hostelling International,             )
    Kimberly Turner, Michael Tolwin, Providence         )
26  Little Company of Mary Medical Center Torrance      )
27  Prospect Medical Group, Tolwin Psychiatric          )
    Medical Group, Inc., Jonathan Reitman, M.D.,        )
28                    Defendants.                       )

- 1 -

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

# COMPLAINT

## JURISDICTION

1.  Subject matter jurisdiction exists in this case pursuant to 28 U.S.C. 1331. Diversity jurisdiction exists pursuant to 28 USC 1332. Supplemental jurisdiction, where necessary, for the District Court to hear Plaintiff's related state law claims, is provided by 28 U.S.C. 1367.

## VENUE

2. Venue for this Action is proper in this District pursuant to 28 U.S.C. § 1391 (b)(2), as a substantial part of the events or omissions giving rise to the claims herein occurred in this District.

## PARTIES

3. Plaintiff is Jonathan VanLoan, a Citizen and Domiciliary of the Commonwealth of Pennsylvania, residing at 12 Westgate Circle, Malvern, Pennsylvania, 19355.

4. The Nation of Islam ("NOI") is a Black Nationalist and Domestic Radical Islamic Terror Organization, with a national headquarters at Mosque Maryam, 7351 South Stony Island Avenue, Chicago, Illinois, 60649. The Nation of Islam has orchestrated a campaign of terror and attempted murder against Plaintiff since January 1, 2014, beginning in downtown Los Angeles, in four different states--California, New Mexico, Utah, and Arizona.

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

5. Minister Louis Farrakhan is the titular leader of the Nation of Islam, with a primary address of Mosque Maryam, 7351 South Stony Island Avenue, Chicago, Illinois, 60649. Upon information and belief, Minister Farrakhan gave the approval to Student Minister Tony Muhammad and other Nation of Islam operatives for the Radical Islamic Terror campaign against, and attempted murder of, Plaintiff, and has continued to give his approval, though Plaintiff has pleaded with him for years to stop.

6. Tony Muhammad, Student Minister to Louis Farrakhan, is, upon information and belief, the West Coast Regional Representative of the Nation of Islam, with an office address, upon information and belief, at Muhammad Mosque #27, 1000-1030 West 87th Street, Los Angeles, CA 90044. Tony Muhammad has orchestrated the campaign and murder attempts against Plaintiff for the Nation of Islam, upon information and belief, since December 15, 2013, in multiple states, including California, Arizona, and New Mexico.

7. The City of Torrance, CA is a municipal corporation, located at 3031 Torrance Blvd, Torrance, CA 90503.

8. Eve Irvine is the Police Chief of Torrance, CA, with an office address of 3031 Torrance Blvd, Torrance, CA 90503.

9. Tyrone F. Gribben is a Torrance, CA police officer, with an office address of 3031 Torrance Blvd, Torrance, CA 90503.

10. Brian McGee is a Torrance, CA police officer, with office address of 3031 Torrance Blvd, Torrance, CA 90503.

11. Patrick Q. Sullivan is the Torrance City Attorney, with an office address of 3031 Torrance Blvd, Torrance, CA 90503. Patrick Sullivan, upon information and belief, participated in the Radical Islamic terror plot to murder Plaintiff on Thursday, January 11th, 2018.

12. Patrick Furey is the Mayor of Torrance, and George Chen, Tim Goodrich, Mike Griffiths, Milton Herring, Aurelio Mattucci, and Geoff Rizzo are all Torrance City Council Members, with an office address of 3031 Torrance Blvd, Torrance, CA 90503.

13. Providence Little Company of Mary Medical Center Torrance is a hospital located at 4101 Torrance Blvd., Torrance, CA 90503.

14. Providence Health & Services owns Little Company of Mary Medical Center Torrance, with a headquarters' address of 1801 Lind Avenue SW, Renton, WA 98057.

15. Rodney F. Hochman is the Chief Executive Officer of Providence Health & Services, with an office address of 1801 Lind Avenue SW, Renton, WA 98057.

16. Garry Olney and Richard Glimp, M.D. are two Providence executives in charge of Little Company of Mary Medical Center Torrance, with an office address of 4101 Torrance Blvd. Torrance, CA 90503.

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

17. The City of Culver City is a California municipal corporation , located at 9770 Culver Blvd., Culver City, CA 90232.

18. Thomas Small, Meghan Sahli-Wells and Goran Erikkson are members of the Culver City City Council.

19. Scott Bixby is the Culver City Police Chief, with an office address of 4040 Duquesne Ave, Culver City, CA 90232. Bixby is responsible for Culver City Police participation in the conspiracy with the Nation of Islam to murder Plaintiff on January 11th and 12th, 2018.

20. Steven Armenta, James Gladden, Ryan Thompson and Michael VanHook are all Culver City Police Officers. Armenta and Gladden actively conspired to murder, and attempted to murder, Plaintiff, on Friday, January 12, 2018, at Southern California Hospital. Thompson and VanHook engaged in a coverup of crimes committed, and refused to investigate Plaintiff's allegations of attempted murder. They are loyal to the Nation of Islam, rather than to the Laws of the United States. These Defendants have an office address of 4040 Duquesne Ave, Culver City, CA 90232.

21. Southern California Hospital is located at 3828 Delmas Terrace, Culver City, CA 90232. Jonathan Reitman M.D. is the Medical Director of the "Miracles" detox unit on the Hospital 6th Floor. Jonathan Reitman refused to investigate Plaintiff's allegations of attempted murder in the detox unit, on Friday, January 12, 2018.

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

Jonathan Reitman's office address is 8484 Wilshire Blvd., #200, Beverly Hills, CA 90211.

22. Prospect Medical Holdings, Inc. is an owner of Southern California Hospital, located at 3415 S Sepulveda Blvd 9th Floor, Los Angeles, CA 90034.

23. Prospect Medical Group, upon information and belief, employs physicians who work at Southern California Hospital, located at 9808 Venice Blvd #404, Culver City, CA 90232.

24. Sean Fowler and Michael Klepin were administrators of Southern California Hospital during January, 2018, with an office address of 3828 Delmas Terrace, Culver City, CA 90232.

25. Mir Nawaz Karim is the Charge Nurse who was on duty in the Southern California Hospital Emergency Room, the evening and day of January 11th and 12th, 2018, and who gave the order to his nurse associates to murder Plaintiff using a sixty percent solution of heart enlargement medicine. His nurse associates then administered that solution into Plaintiff's arm at the right elbow, almost killing him. Karim resides at 2059 Artesia Blvd., Apt. 13, Torrance, CA 90504.

26. Jason Driver was the Director of Emergency Services at Southern California Hospital during January, 2018. Driver refused to investigate Plaintiff's claims of Muslim jihad and attempted murder in the Emergency Room, and never contacted Plaintiff after the events occurred. Driver's office address was 3828 Delmas Terrace, Culver City, CA 90232.

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

27. Samuel Lee is the CEO of Prospect Medical Holdings, Inc., with an office address of 3415 S Sepulveda Blvd 9th Floor, Los Angeles, CA 90034.

28. Samuel Green & Partners is a private equity firm with an ownership interest in Prospect Medical Holdings, Inc. and Southern California Hospital. The firm refused to investigate Plaintiff's allegations of Muslim jihad and attempted murder in the Emergency Room and detox unit of Southern California Hospital, though Plaintiff complained to Leonard Green and his partners personally, many times after the events occurred. Their office address is 11111 Santa Monica Blvd., Suite 2000, Los Angeles, CA 90025.

29. Lisa Kahn is a CA licensed psychologist, and employed by Tolwin Psychiatric Medical Group, Inc., a California corporation. Kahn conspired with the Nation of Islam, the Culver City Police Department, and Marat Shpolyansky to murder Plaintiff by psychotropic drug overdose in the "Miracles" detox unit of Southern California Hospital on Friday, January 12, 2018. Kahn's office address is 3831 Hughes Avenue, Culver City, CA, 90232.

30. Marat Shpolyansky, is a CA licensed nurse practitioner and employed by Tolwin Psychiatric Medical Group, Inc. Shpolyansky ordered a nurse to administer a lethal dose of medication to Plaintiff in the "Miracles" detox unit on Friday, January 12, 2018, or discharge Plaintiff from the facility if he refused. Shpolyansky's office address is 3831 Hughes Avenue, Culver City, CA, 90232.

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

31. Michael Tolwin is the principle shareholder of Tolwin Psychiatric Medical Group, Inc. and employs Lisa Kahn and Marat Shpolyansky. Tolwin refused to respond to Plaintiff's allegations of attempted murder by his employees. Tolwin's office address is 3831 Hughes Avenue, Culver City, CA, 90232.

32. Tolwin Psychiatric Medical Group, Inc. a California corporation, has an agent for service of process at 528 North Palm, Beverly Hills, CA 90212. The Corporation employs, upon information and belief, Michael Tolwin, Marat Shpolyansky, and Lisa Kahn.

33. The City of Santa Monica, CA is a CA municipal corporation, with an address of 1685 Main Street, Santa Monica, CA 90401.

34. Kenneth Semko was the Interim Santa Monica Police Chief during January, 2018, when the Nation of Islam, the Santa Monica Police Department, and employees of the Santa Monica Hostel conspired to murder Plaintiff, and attempted to murder Plaintiff, on Friday and Saturday, January 12th and 13th, 2018. Semko resides at 23521 Summerglen Place, Valencia, CA 91354.

35. Gleam Davis, Terry O'Day, Tony Vazquez, Kevin McKeown, Sue Himmelrich, and Ted Winterer are all members of the Santa Monica City Council, with supervisory authority over the Santa Monica Police Department, and an office address of 1685 Main Street, Santa Monica, CA 90401.

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

36. American Youth Hostels, Inc., dba Hostelling International USA is the organization that owns the Santa Monica Hostel, with an address of 8401 Colesville Road, Suite 600, Silver Spring, MD 20910.

37. Kimberly Turner is the Manager of the Santa Monica Hostel, with an office address of 1436 2nd Street, Santa Monica, CA 90401.

38. Hostelling International is the worldwide federation that is responsible for the branding and oversight of the Santa Monica Hostel. HI has a headquarters address of Gatehouse, Fretherne Road, Welwyn Garden City, United Kingdom.

## STATEMENT OF FACTS
### BRIEF HISTORY

39. The preceding paragraphs are incorporated herein., as if fully set forth at length.

40. The genesis of Plaintiff's problem with the Nation of Islam occurred on Saturday night, December 14, 2013, when, at the apartment of Annette Pike in South Los Angeles, an African-American man who Plaintiff had never met before, Vince Allen, physically threatened Plaintiff's life, causing him to have to flee Ms. Pike's apartment near midnight.

41. Later that night, in Santa Monica, Plaintiff sent some angry text messages about Vince to his then African-American girlfriend, Brandy M. Thomas, who was still at Ms. Pike's apartment.

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

42. Those text messages, interpreted by Vince Allen as racist, were taken by him to Mosque #27 and Student Minister to Louis Farrakhan Tony Muhammad. According to Ms. Pike, who later explained to Plaintiff what had happened,  a "hit" (Ms. Pike said to Plaintiff- "you have now become a person of interest to the N.O.I.") was placed on Plaintiff's life, and the Nation of Islam commenced a campaign of terror and attempted murder against Plaintiff, which has now lasted over five years, traversing seven states.

43. A more complete factual history of the case is recounted in the Complaints previously filed in this matter, in the CA Central District (2:17-cv-06912) and in the District of Arizona (4:18-cv-00226), which Arizona case is now on appeal in the Ninth Circuit (18-16813)

## STATEMENT OF FACTS FOR THIS COMPLAINT

44. Upon information and belief, on Thursday and Friday, January 4th and 5th, 2018, City of Torrance Police Officers Tyrone Gribben and Brian McGee conspired with the Nation of Islam, and employees in the Emergency Room at Little Company of Mary Medical Center in Torrance, to murder Jonathan VanLoan.

45. Early in the evening of Thursday, January 4th, 2018,  Officers Gribben and McGee had responded to Plaintiff's 911 call earlier in the evening near Starbucks located at 4437 Sepulveda Blvd. in Torrance.

46. Later that night, the Officers responded to another call from the night manager of Sprouts Farmers Market on Vista Montana in Torrance, where Plaintiff

had gone to ask for help. When the Officers arrived, Plaintiff expressed to them his concern that he was being surveilled that night by the Nation of Islam.

47. The Officers agreed to follow Plaintiff home (he was on foot) to his residence at 4608 Newton Street, Torrance, CA. When Plaintiff got home, he observed that the Officers parked in front of his house and turned the vehicle lights off. The Officers remained in front of the house for a period of time, then left.

48. Plaintiff thereafter developed discomfort in his chest and asked his roommate, William Tyler Horn, to take him to Providence Little Company of Mary Medical Center Torrance, which Mr. Horn did, dropping him at the Emergency Room. When he arrived in the E.R., after vitals, he was taken into a hallway, where two young male medical technicians injected something into Plaintiff's left arm, which immediately caused his heart rate to increase, and Plaintiff was in extreme cardiac distress. This attempt to murder Plaintiff followed an ongoing pattern by those involved in the Nation of Islam conspiracy to murder Plaintiff, in hospitals, in multiple municipalities, using medications to raise Plaintiff's heart rate, inducing cardiac arrest.

49. Plaintiff was taken to a private "room" in the back of the E.R., and his cell phones were confiscated and he was not allowed to call his family. In that same area, Plaintiff observed three black men posing as security guards or other personnel without apparent legitimate reason to be in the vicinity of Plaintiff. They threatened Plaintiff with verbal and non-verbal cues, and Plaintiff, already in cardiac distress,

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

was in fear for his life. Upon information and belief, those men were Nation of Islam operatives, with no legitimate medical or other reason for being in the Emergency Room, aside from terrorizing Plaintiff and observing him die.

50. No doctors or nurses came to examine Plaintiff, he was left to suffer for hours. Plaintiff observed a Caucasian police officer, upon information and belief, a Torrance Police Officer, who was in the same area, also without apparent purpose, and seemed to be monitoring Plaintiff's condition, that is to say, whether Plaintiff would live or die.

51. Plaintiff did not, however, die, and the next day was discharged.

52. Plaintiff thereafter attempted to contact Torrance City employees, about his concerns regarding conspiracy to commit murder and attempted murder, involving Torrance police officers. There was no way that Providence Little Company of Mary Medical Center would have been aware that Plaintiff would come to the Hospital, unless they had been tipped in advance by Officers Gribben and McGee, who knew that VanLoan was in, or might be in, distress. Plaintiff did not call 911 that night.

53. When Plaintiff tried to get an explanation from the City of Torrance, Torrance Police Chief Eve Irvine blocked Plaintiff's email address, and no person in the Torrance City government ever responded to Plaintiff to address his concerns.

54. Plaintiff also contacted Providence Health & Services, the owner of Providence Little Company of Mary Medical Center Torrance, but the Hospital's Risk Management department was not able to answer Plaintiff's questions regarding

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

the Hospital E.R.'s treatment of him, and, upon information and belief, did not do a full investigation into Plaintiff's allegations of attempted murder. Providence executives were completely unresponsive to Plaintiff's allegations of attempted murder at a hospital they owned.

55. When Plaintiff asked hospital risk management why three black thugs were present near him in the emergency room as he suffered, Plaintiff was told that he (Plaintiff) had caused a problem, requiring the presence of three security guards all night.

### **MORE PROBLEMS**

56. The following week, on Thursday, January 11th, 2018, when Plaintiff left his residence at 4608 Newton Street in Torrance early in the morning, he observed he was under surveillance almost immediately by black Nation of Islam operatives.

57. Plaintiff went back to his house, but felt that it was unsafe to remain there, not only for himself but the other occupants of the house, including Brandy M. Thomas, Plaintiff's former girlfriend from 2013, who was visiting Plaintiff, and William Tyler Horn, the owner of the house.

58. Plaintiff left the house and walked to his church (Coast Christian Fellowship at 4000 Pacific Coast Highway in Torrance), and met with a staff member, told her that he felt his life was in danger and asked for and received prayer.

59. After VanLoan left the church he went to Sprouts Market in the Vista Plaza located at 4230 in the Vista Pacific Coast Highway. As had happened in the past, a

large number of Nation of Islam operatives, including African-Americans, Hispanics, bikers and others followed Plaintiff into Sprouts, and intimidated him there.

60. Plaintiff spoke with one NOI operative, an Asian man, who Plaintiff recognized from a prior attempt on Plaintiff's life by the Nation of Islam in Albuquerque, New Mexico. That man did not deny that there was an operation against Plaintiff that day (Thursday, January 11, 2018), but asked Plaintiff to "please not mention that you saw me in here".

61. Plaintiff was waiting for a funds transfer from a friend, and after about an hour, he left Sprouts and made a bee line for his bank, U.S. Bank, also located in the Vista Center, across the parking lot. It was now after 12 Noon.

62. Once in the bank, Plaintiff explained to bank personnel that he was waiting for a funds transfer, and asked to wait inside the bank (because Plaintiff knew it was not safe for him to be outside). The Bank staff agreed to allow Plaintiff to wait.

53. Plaintiff then called Torrance City Attorney Patrick Sullivan at his office to see if he could help allay the campaign against Plaintiff's life that was in progress that day.

54. Patrick Sullivan spoke with Plaintiff for a few minutes, as Plaintiff explained to him what he was observing taking place in Torrance that day, and a brief history of his problem with the N.O.I. Patrick Sullivan seemed somewhat incredulous, as though he was completely ignorant of any problem that Plaintiff had with the Nation of Islam, though his protestations to the contrary seemed

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

disingenuous to Plaintiff, betraying the fact that Patrick Sullivan may well have been aware of Plaintiff's larger problem, if not specifically aware of what was taking place that day.

55. Patrick Sullivan told Plaintiff that he would do some checking and call Plaintiff back, though Sullivan never did call Plaintiff back.

56. Plaintiff told Sullivan during their conversation that it was his plan to go to the Miracle Detox Unit at Southern California Hospital later that night, because Plaintiff believed, based on his past experiences there, that he would be safe there.

57. Upon information and belief, Patrick Sullivan informed the Nation of Islam or its co-conspirators of Plaintiff's plans, because when Plaintiff did go to Southern California Hospital later that night, there was already a well-orchestrated plan underway to murder Plaintiff in the Emergency Room of that Hospital.

58. Plaintiff finally received the funds he was waiting for and left U.S. Bank via a ride-share service, and went to Brio Coastal Bar & Kitchen in the Del Amo Fashion Center, located at 3525 Carson Street in Torrance, to prepare himself to go to the Miracles Detox Unit at Southern California Hospital. Plaintiff left Brio to go to the Hospital a couple of hours later, arriving at the Hospital at about midnight.

## ATTEMPTED MURDER AT SOUTHERN CALIFORNIA HOSPITAL

59. When he arrived at the Emergency Room at Southern California Hospital shortly after midnight on Thursday, January 11th, 2018, Plaintiff knew he had to be

medically cleared in the Emergency Room, before he could be admitted to the Miracle Detox Unit on the 6th Floor of the Hospital.

60. Shortly after Plaintiff arrived at the E.R., checked in, and was waiting in the lobby area of the E.R., a rough looking black man came into the E.R. with a bicycle.

61. The black man stored his bicycle somewhere in an area adjacent to the emergency room. When the man came into the area where Plaintiff was sitting, the man looked at and greeted Plaintiff, as if he knew him, though Plaintiff had never met (or seen) the man in his life.

62. Then, the black man (who Plaintiff later learned was named "Dennis") said these words to Plaintiff-- "Man, are you in trouble!".

63. Plaintiff immediately became concerned that there might be a Nation of Islam murder plot against him because events like this one had happened to Plaintiff before.

64. Plaintiff noticed that the shades of the windows of the employees who do intake at the Emergency Room were all pulled down - there were no Hospital employees visible from the E.R. waiting area.

65. Plaintiff became concerned that Dennis might kill him right there, and Plaintiff began moving about the waiting area, intermittently going into the restroom to hide.

66. Meanwhile, Dennis seemed to be amused at Plaintiff's plight, and did nothing to allay his concerns, though Plaintiff perceived then, and later, that Dennis was attempting to give Plaintiff some information, so that Plaintiff would be aware of what was happening. Dennis was not "all in" on the conspiracy to murder Plaintiff that night.

67. As much as Plaintiff had prior problems with police departments colluding with the Nation of Islam in attempts to murder him (Los Angeles, Redding, Albuquerque, Santa Fe, Torrance, Tucson, Mesa, etc.) his fear level was such that Plaintiff called 911 to report his concern that his life was in danger in the Emergency Room at Southern California Hospital.

68. In about twenty to thirty minutes, two Culver City Police Officers, Steven Armenta and James Gladden, entered the Emergency Room and approached Plaintiff.

69. Plaintiff knew immediately by their attitudes that they were not going to be sympathetic to Plaintiff. They were not at all concerned about Plaintiff's plight, and seemed amused by it.

70. Plaintiff explained to the officers that, based on his extensive history with the NOI, and the circumstances that night, including the presence of Dennis,  Plaintiff felt that his life was in danger.

71. The Officers ordered Plaintiff to stop moving around and to sit down. Plaintiff was afraid for his life and was having a very difficult time sitting down. He tried again to enter the restroom, but the Officers ordered him to stay seated.

72. The Officers did nothing by way of offering any assistance to Plaintiff, either offering to take him someplace else, or by doing or saying anything to relieve Plaintiff of his concerns that his life was in danger. They kept looking towards the door, as if they were expecting someone else to come into the Emergency Room. These gestures only increased Plaintiff's fear.

73. Soon, the Officers announced that "We are leaving." They both then left, leaving Plaintiff in worse shape emotionally than the Officers had found Plaintiff. Plaintiff was terrified.

74. A few minutes later, Plaintiff made a decision to try to escape. He ran out of the Emergency Room, made a left and across Delmas Terrace.

75. Two black security guards immediately ran out of the Emergency Room and chased Plaintiff.

76. Plaintiff ran into the main Hospital building, made a right and ran through the kitchen area and out some back doors onto a loading dock. There was a truck parked at the dock, and a man unloading boxes. Plaintiff ran up to him, hoping that the security guards would stop chasing him.

77. However, at this point, the black security guards caught up with Plaintiff and dragged him back to the Emergency Room, almost breaking his arm in the process.

78. Plaintiff was then was taken inside the E.R., and was terrified for his life, and unable to leave. In a little while, the Muslim charge nurse on duty, Mir Nawaz

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

Karim, instructed a female brunette nurse to administer a 60% solution (Plaintiff overheard them discussing it, and heard the number 60% referenced) of heart enlargement medicine into Plaintiff's right arm at the elbow, which she did. (Exhibit 1 - picture of bruise the administration of heart enlargement medicine left on Plaintiff's right arm)

79. Though Plaintiff pleaded with Emergency Room personnel not to murder him, not one single Emergency Room employee did anything to stop the murder attempt, they were all complicit, aiding and abetting in Plaintiff's attempted murder.

80. The heart enlargement medication nearly killed Plaintiff. It took him about five hours to survive through the 60% enlargement of his heart. Plaintiff ripped Psalm 91 out of his Bible and placed it over his heart, and prayed continually that the God of Abraham, Isaac and Jacob would spare his life.

81. While he was suffering, Plaintiff noticed that the black man Dennis who he met in the waiting room was in a bed next to his. A nurse was asking Dennis for a urine, and it became apparent to Plaintiff that the Hospital was going to use Dennis' urine to blame Plaintiff's murder on a methamphetamine overdose, based on urine that was Dennis', and not Plaintiff's. This was the reason that Dennis was present.

82. As morning arrived, Plaintiff was sure that someone from the Miracles Detox Unit would come to rescue him from the E.R., but no one did.

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

83. When a Jewish E.R. physician arrived that morning, Plaintiff attempted to complain to him, but that physician said: "If you say one more word about this, I will discharge you from this Hospital immediately."

84. Plaintiff was admitted to the Miracles Detox on the 6th Floor later that day, but the attempt to murder him continued.

85. Dennis, the man who had told Plaintiff he was in "trouble" in the Emergency Room was also there, along with, Plaintiff surmised, some other Nation of Islam thugs, men who did not seem to be on the Unit for recovery purposes.

86. And Plaintiff was terrified.

87. After Plaintiff arrived at "Miracles", a psychologist named Dr. Lisa Kahn, who Plaintiff had seen during previous visits to Miracles, asked to speak with him privately.

88. Inexplicably, Kahn seemed angry with Plaintiff, like he had done something wrong. Plaintiff was shocked, why would Kahn be angry with him, and not sympathetic about his horrendous plight in the E.R.? It became apparent to Plaintiff that his problem was not over--now Kahn, a psychologist on the detox unit was conspiring to murder him too.

89. Kahn continued to demand that something had to be done--Plaintiff would not be allowed to recover from his ordeal, he must now meet with Kahn's associate Marat Shpolyansky to discuss treatment. Plaintiff had no choice in the matter.

90. Kahn disappeared and Shpolyansky, a nurse practitioner, appeared, solicitous, sheepish, annoying and unable to make eye contact with Plaintiff, and asked to speak with Plaintiff privately in Plaintiff's room. Plaintiff had by then learned that his roommate was none other than Dennis. Plaintiff attempted to get his room assignment changed, unsuccessfully.

91. After Shpolyansky and Plaintiff went to Plaintiff's room, Shpolyansky explained that Plaintiff must take a combination of psychotropic drugs that Shpolyansky would prescribe. Plaintiff, completely lucidly asked "Why?". Shpolyansky, trying to be persuasive, was hemming and hawing --unable to give Plaintiff any kind of a straight answer. But he stammered that Plaintiff did not have any choice, that he *must* take these drugs, which Shpolyansky would not specifically identify, or face consequences, including discharge from the detox.

92. Plaintiff agreed because he simply wanted to get rid of Shpolyansky, and Shpolyansky disappeared.

93. Plaintiff waited for a few minutes and then walked to a common area of the Unit, hoping that maybe he could relax.

94. However, in a few minutes, a young female brunette nurse approached Plaintiff holding four or five large (huge) vials of medication and a syringe in her hands. She asked Plaintiff "Are you ready?"

95. Plaintiff looked incredulously at the vials, and said to the nurse, "You're kidding right?", to which the nurse replied, "Let's go back to your room."

96. Plaintiff said to the nurse, "That amount of medication is going to kill me, or knock me out so that the black man in my room can kill me. There is no way I am going to let you give me that amount of medication, I'm sorry."

97. The nurse responded, "Well then you're going to be transferred from this Hospital to another facility."

98. Plaintiff knew that if this happened, it would only be another opportunity for the Nation of Islam, the Police, and whoever else to murder him. At this point, Plaintiff went into panic mode, using all the available money he had on him to call friends and family from the payphone on the unit, asking them to call the F.B.I., and telling him that the Miracles Detox staff at Southern California Hospital were trying to murder him.

99. In the process of calling people, Plaintiff called a friend of his, "C.T.". "C.T." immediately recognized the terror in Plaintiff's voice, and said that he was in the vicinity of Culver City, and would come pick him up.

100. Plaintiff was relieved, but it was apparent to him that the N.O.I. operatives on the detox unit were now plotting to murder Plaintiff, while Plaintiff was leaving the Hospital. It was one of the most stressful and terrifying phenomena that Plaintiff had ever experienced in life, including all of the terrifying experiences with the Nation of Islam over the last five years.

101. And Plaintiff was extremely terrified.

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

102. "C.T." eventually appeared on the Unit, and Plaintiff left with him, all the while observing the machinations that the N.O.I. was still engaged in, to murder him, including as he left the Hospital, and on Delmas Terrace. However, because he was with "C.T." (and because of the Divine Protection of Almighty God) Plaintiff left Culver City in "C.T.'s" car.

103. After these events, Claimant contacted the Culver City Police Department, and the City of Culver City but the Department and the City refused to investigate his claims of gross malfeasance and the commission of crimes by the Culver City Police Department, by conspiring with the Nation of Islam and employees at Southern California Hospital Emergency Department to murder Claimant on Friday, January 12, 2018.

104. Plaintiff also attempted to contact Southern California Hospital's administration, including the then Hospital Administrators, the then Director of Emergency Services Jason Driver, Mir Nawaz Karim, the Muslim charge nurse who ordered his murder, Jonathan Reitman, Director of the Detox Unit, the Hospital owners, Prospect Medical Systems, Inc., and Leonard Green & Partners, but no one, not one person, ever responded to Plaintiff's dire concerns about his attempted murder in their Hospital. Not one person ever acknowledged what happened.

## **SANTA MONICA**

105. After they left Culver City, "C.T." asked Plaintiff where he wanted to stay that night. As Plaintiff had spent many nights at the Hostelling International USA Los

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

Angeles Santa Monica Hostel, located at 1436 2nd Street in Santa Monica, since his arrival in Los Angeles in May of 2013, and felt he would be safe there, Plaintiff asked "C.T." to take him there.

106. When they arrived, the first unusual thing that Plaintiff observed was that the front desk staff on duty when he arrived, a young Caucasian man and woman, informed Plaintiff that there were no shared dorm beds available, but only a private room.

107. Of all the many times Plaintiff had stayed at the Hostel, this had never happened--there were always shared dorm beds available. It was also January, there couldn't be a full house of young European travelers. The price of the private room was $140, and "C.T." offered to pay. Plaintiff was completely exhausted, and his nerves were totally shot, as he had just survived two days of intense terrorism, and two murder attempts at Southern California Hospital, so he reluctantly agreed to a private room.

108. "C.T." then left the Hostel and Plaintiff went upstairs to his room. The next unusual and disturbing thing that Plaintiff noticed was there was no way to lock the door of his room from the inside. There was no lock on the inside of the door, no deadbolt of any kind, so that anyone who had a key could enter Plaintiff's room from the outside at any time. This was alarming to Plaintiff.

109. This was a very foreboding reality to Plaintiff, given his understanding and experience as to how the Nation of Islam operates, and the degree of malevolence

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

the organization possesses. His room was not a shared room, it was private. There certainly should be a way to lock the door from the inside.

110. Plaintiff then heard the door of the room next to him open and shut, several times, with a loud banging sound. Plaintiff felt that was also unusual, it didn't feel "right" to him, there were no people talking, just a door banging.

111. Plaintiff decided to go down to the front desk and express his concerns to the young people who had checked him in. But when he went down, the young Caucasian man and woman who had checked him in were gone, and there was now one black man behind the desk, about 40 years old. Plaintiff, in all his years of staying at the Hostel, had never observed a lone black man of middle age working at the front desk.

112. Plaintiff nevertheless expressed his concerns to the black man about not being able to lock his door from the inside, and the banging of the door without hearing voices he had heard from the room next door.

113. The black man (thug) behind the desk had inadequate answers for Plaintiff's questions, and Plaintiff now concluded that this black man, who had mysteriously and quickly replaced the two young Caucasians who were at the front desk when Plaintiff checked in, might very well be a Nation of Islam operative, and that the conspiracy to murder him was now still ongoing at the Hostel.

114. And Plaintiff became very terrified for his life.

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

115. The black man advised Plaintiff that nothing was remiss, and that he would be safe in his room, but Plaintiff did not believe, or trust, this man

116. So Plaintiff, without funds to leave the Hostel, now had to begin calculating and praying as to how he would survive the night at the Hostel.

117. Plaintiff began, now in an agitated state, to go upstairs, stay for a few minutes, and evaluate what to do, then go back downstairs to the lobby. The difficulty about being upstairs was that, aside from the fact that he could not lock his door, there did not seem to be many people staying on that floor. Plaintiff knew that it was impossible for him to try to sleep.

118. Plaintiff began a pattern of going up to his room, staying for a few minutes, then going back down to the front desk to see if the black man might say something that would allay Plaintiff's fears. Plaintiff barricaded his door from the inside with the bunk bed while he was in the room.

119. At about 2:00 A.M., inside the women's restroom across the hallway from Plaintiff's room, Plaintiff heard a black man coughing. Plaintiff, not knowing what to do, started calling people on his phone, standing in the hallway outside of his room, in a loud voice, trying to signal the black man in the ladies' room that Plaintiff knew he was there, and if there were any other persons present on the floor, making those people aware of Plaintiff's presence. This man was the occupant of the room nect to Plaintiff, and was present in the Hostel to murder Plaintiff.

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

120. Plaintiff then ran downstairs and called 911 for the first time. It was about 2 A.M. 911 put Plaintiff through to the Santa Monica Police. Plaintiff explained that he was at the Hostel on 2nd Street, had just survived multiple murder attempts by the Nation of Islam in Culver City, and was concerned, based on what Plaintiff was observing and hearing at the Hostel, that a plot was underway to murder him there.

121. The Police Officer with whom Plaintiff spoke told him that the Police were very busy that night, but they would respond as soon as they could.

122. The Police did not respond. The black Nation of Islam operative at the front desk had now stopped communicating with Plaintiff. Plaintiff both observed and heard the man communicating with a 3rd party from behind the front desk via a cell phone or other messaging device. Plaintiff could hear the audio transmissions. It seemed like the transmissions were about Plaintiff.

123. Plaintiff ran back upstairs but did not feel safe. He then ran back downstairs to the lobby. Now, crouched in the corner of the Hostel lobby was a young man with dark hair of obvious Middle Eastern descent. He was wearing some kind of a robe or shaw under which he could have easily been concealing some kind of a weapon.

124. Plaintiff asked the black man behind the front desk who that man was but the black man refused to communicate with Plaintiff. Plaintiff overheard the male voice communication advising the black man behind the front desk to make sure that he was "out of the line of fire".

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

125. And Plaintiff was terrified.

126. Plaintiff called 911 again, and informed the police that there was now a Muslim man of Middle Eastern descent crouching in the lobby of the Hostel on 2nd. The police informed Plaintiff that they were busy with other calls but would send an officer when possible.

127. Claimant again called 911, around 3:00 A.M., but again he was told that the Police were too busy, and no one would be responding to his call. Plaintiff continued to call 911, getting the same response.

128. Plaintiff became very alarmed now, but was afraid to leave the Hostel, because he observed people outside, operating a street cleaner, but they did not appear to be dressed as normal city employees. Plaintiff was concerned they were part of the conspiracy to murder him, because when he was upstairs, the street cleaner stopped in front of the Hostel and remained there for at least 10 minutes.

129. Claimant sensed the noise from the street cleaner was to cover up the harm the black man in the ladies' bathroom was going to do to Claimant, namely kill him, after Claimant went into his room to sleep, and that black man came into Claimant's room.

130. Eventually the Muslim man in the lobby left.

131. At daybreak, Plaintiff ran out of the Hostel to Starbucks on the 3rd Street Promenade. A short while later, a Los Angeles County Deputy Sheriff came into that

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

Starbucks with three or four Muslim men of Middle Eastern descent with him, and Claimant felt that was foreboding.

132. In about 30 minutes, Claimant observed the Deputy Sheriff look at his cell phone and gasp in surprise.

133. He and the Muslim men quickly left Starbucks, and Claimant felt that the "hit" on his life may had been called off.

134. When Plaintiff went to order another coffee, the female barista, who Plaintiff had never met before, said, "You certainly look relieved!" Plaintiff attempted to have the barista explain what she meant but she would not.

135. Claimant had survived yet another murder attempt, only because of the Grace of God, and His Son Jesus Christ, who were protecting him from the Police and the Muslim jihadis, and the Nation of Islam, again.

136. Claimant went back to his room at the Hostel, and about 9:00 A.M., a Santa Monica Police Officer knocked on his door with a male Hostel manager. The Officer seemed apologetic for responding so late and told Claimant to keep "taking his medicine". How did that Police Officer know that Plaintiff took medicine?

137. Claimant knew this was a "CYA" move by the Santa Monica Police Department, because they had been complicit in the plot to murder Plaintiff the night before at the Hostel, and now they were "covering their tracks", after the fatwa was called off.

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

138. Plaintiff checked out at 11:00, and later learned from the Hostel Manager, Kimberly Turner, that he had been banned from the Hostel on 2nd. For life--

139. Plaintiff thereafter attempted to communicate with the City of Santa Monica about what had happened to him at the Santa Monica Hostel, but no response was ever forthcoming.

140. Upon information and belief, Santa Monica then Interim Police Chief Kenneth Semko was subsequently forced into "retirement" because of Police participation in a Radical Islamic terror plot to murder Plaintiff at the Hostel on 2nd, on Friday and Saturday, January 12th and 13th, 2018.

141. Plaintiff also attempted to communicate many times with Hostelling International USA, but no response has ever been received from that organization.

**COUNT ONE  - ASSAULT - AS AGAINST THE CITY OF TORRANCE, CALIFORNIA, EVE IRVINE, TYRONE GRIBBEN, BRIAN MCGEE, PATRICK SULLIVAN, PATRICK FUREY, GEORGE CHEN, TIM GOODRICH, MIKE GRIFFITHS, MILTON HERRING, AURELIO MATTUCCI, GEOFF RIZZO, LOUIS FARRAKHAN, TONY MUHAMMAD, THE NATION OF ISLAM, DOE DEFENDANTS 1-10, LITTLE COMPANY OF MARY MEDICAL CENTER TORRANCE, PROVIDENCE HEALTH & SERVICES, RODNEY F. HOCHMAN, GARRY OLNEY, RICHARD GLIMP, M.D.,  THE CITY OF CULVER CITY, CALIFORNIA, THOMAS SMALL, MEGHAN SAHLI-WELLS, GORAN ERIKSSON, SCOTT BIXBY, RYAN THOMPSON, MICHAEL VAN HOOK, STEVEN ARMENTA, JAMES GLADDEN, SEAN FOWLER, MICHAEL KLEPIN, MIR NAWAZ KARIM, JASON DRIVER, SOUTHERN CALIFORNIA HOSPITAL, PROSPECT MEDICAL HOLDINGS, INC., PROSPECT MEDICAL GROUP. MICHAEL TOLWIN, TOLWIN PSYCHIATRIC MEDICAL GROUP, INC., SAMUEL LEE, LEONARD GREEN & PARTNERS, LISA KAHN, JONATHAN REITMAN, MARAT SHPOLYANSKY, THE CITY OF SANTA MONICA, CALIFORNIA, KENNETH SEMKO, GLEAM DAVIS, TERRY O'DAY, TONY VAZQUEZ, KEVIN MCKEOWN, SUE HIMMELRICH, TED**

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

**WINTERER, AMERICAN YOUTH HOSTELS, INC., HOSTELLING
INTERNATIONAL,  KIMBERLY TURNER, JOINTLY AND SEVERALLY**

142. The preceding paragraphs are incorporated herein, as if fully set forth at length.

143. All named Defendants, either directly or vicariously, threatened to touch Jonathan VanLoan in a harmful or offensive manner; and Jonathan VanLoan reasonably believed, and it reasonably appeared to him, that all Defendants, directly or vicariously, were about to carry out those threats of harmful and offensive touching; and Jonathan VanLoan did not consent to those threats of harmful or offensive touching; and Jonathan VanLoan was harmed by being put in extreme dire fear for his life; and  all named Defendants' conduct was a substantial factor causing Jonathan VanLoan's harms.

**COUNT TWO  - BATTERY (ATTEMPTED MURDER) - AS AGAINST THE CITY OF TORRANCE, CALIFORNIA, EVE IRVINE, TYRONE GRIBBEN, BRIAN MCGEE, PATRICK SULLIVAN, PATRICK FUREY, GEORGE CHEN, TIM GOODRICH, MIKE GRIFFITHS, MILTON HERRING, AURELIO MATTUCCI, GEOFF RIZZO, LOUIS FARRAKHAN, TONY MUHAMMAD, THE NATION OF ISLAM, DOE DEFENDANTS 1-10, PROVIDENCE HEALTH & SERVICES, LITTLE COMPANY OF MARY MEDICAL CENTER TORRANCE, RODNEY F. HOCHMAN, GARRY OLNEY, RICHARD GLIMP, M.D., THE CITY OF CULVER CITY, CALIFORNIA, THOMAS SMALL, MEGHAN SAHLI-WELLS, GORAN ERIKSSON, SCOTT BIXBY, RYAN THOMPSON, MICHAEL VAN HOOK, STEVEN ARMENTA, JAMES GLADDEN, MIR NAWAZ KARIM, JASON DRIVER, SOUTHERN CALIFORNIA HOSPITAL, JAMES GLADDEN, SEAN FOWLER, MICHAEL KLEPIN, PROSPECT MEDICAL HOLDINGS, INC., SAMUEL LEE, LEONARD GREEN & PARTNERS, LISA KAHN, JONATHAN REITMAN, MARAT SHPOLYANSKY, THE CITY OF SANTA MONICA, CALIFORNIA, KENNETH SEMKO, GLEAM DAVIS, TERRY O'DAY, TONY VAZQUEZ, KEVIN MCKEOWN, SUE HIMMELRICH, TED**

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

**WINTERER, AMERICAN YOUTH HOSTELS, INC., HOSTELLING
INTERNATIONAL,  KIMBERLY TURNER, MICHAEL TOLWIN, TOLWIN
PSYCHIATRIC MEDICAL GROUP, INC., JOINTLY AND SEVERALLY**

144. The preceding paragraphs are incorporated herein, as if fully set forth at
length.

145. All named Defendants touched Plaintiff, individually or vicariously, with
the intent of harming Plaintiff; and Plaintiff did not consent to this touching; and
Plaintiff was harmed by all Defendants' conduct, directly or vicariously; and a
reasonable person in Plaintiff's position would have been extremely offended,
injured, and damaged by this touching.

**COUNT THREE  - FALSE IMPRISONMENT - AS AGAINST THE CITY OF
TORRANCE, CALIFORNIA, EVE IRVINE, TYRONE GRIBBEN, BRIAN
MCGEE, PATRICK SULLIVAN, PATRICK FUREY, GEORGE CHEN, TIM
GOODRICH, MIKE GRIFFITHS, MILTON HERRING, AURELIO
MATTUCCI, GEOFF RIZZO, LOUIS FARRAKHAN, TONY MUHAMMAD,
THE NATION OF ISLAM, DOE DEFENDANTS 1-10, LITTLE COMPANY
OF MARY MEDICAL CENTER TORRANCE, PROVIDENCE HEALTH &
SERVICES, RODNEY F. HOCHMAN, GARRY OLNEY, RICHARD GLIMP,
M.D., THE CITY OF CULVER CITY, CALIFORNIA, THOMAS SMALL,
MEGHAN SAHLI-WELLS, GORAN ERIKSSON, SCOTT BIXBY, RYAN
THOMPSON, MICHAEL VAN HOOK, STEVEN ARMENTA, JAMES
GLADDEN, MIR NAWAZ KARIM, JASON DRIVER, SOUTHERN
CALIFORNIA HOSPITAL, SEAN FOWLER, MICHAEL KLEPIN,
PROSPECT MEDICAL HOLDINGS, INC., SAMUEL LEE, LEONARD
GREEN & PARTNERS, LISA KAHN, JONATHAN REITMAN, MARAT
SHPOLYANSKY, THE CITY OF SANTA MONICA, CALIFORNIA,
KENNETH SEMKO, GLEAM DAVIS, TERRY O'DAY, TONY VAZQUEZ,
KEVIN MCKEOWN, SUE HIMMELRICH, TED WINTERER, AMERICAN
YOUTH HOSTELS, INC., HOSTELLING INTERNATIONAL,  KIMBERLY
TURNER, MICHAEL TOLWIN, TOLWIN PSYCHIATRIC MEDICAL
GROUP, INC., JOINTLY AND SEVERALLY**

146. The preceding paragraphs are incorporated herein, as if fully set forth at
length.

147. All named Defendants, individually or vicariously, intentionally deprived Plaintiff of his freedom of movement by use of physical barriers, force, threats of force, menace, fraud, deceit, and unreasonable duress; and that the threats, confinement and detention compelled Plaintiff to stay or go somewhere for some appreciable time; and Plaintiff did not knowingly consent; and Jonathan VanLoan was actually harmed; and all Defendants' conduct, individually or vicariously, was a substantial factor in causing Jonathan VanLoan's harm.

**COUNT FOUR  - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS - AS AGAINST THE CITY OF TORRANCE, CALIFORNIA, EVE IRVINE, TYRONE GRIBBEN, BRIAN MCGEE, PATRICK SULLIVAN, PATRICK FUREY, GEORGE CHEN, TIM GOODRICH, MIKE GRIFFITHS, MILTON HERRING, AURELIO MATTUCCI, GEOFF RIZZO, LOUIS FARRAKHAN, TONY MUHAMMAD, THE NATION OF ISLAM, DOE DEFENDANTS 1-10, PROVIDENCE HEALTH & SERVICES, LITTLE COMPANY OF MARY MEDICAL CENTER TORRANCE, RODNEY F. HOCHMAN,GARRY OLNEY, RICHARD GLIMP, M.D.,  THE CITY OF CULVER CITY, CALIFORNIA, THOMAS SMALL, MEGHAN SAHLI-WELLS, GORAN ERIKSSON, SCOTT BIXBY, RYAN THOMPSON, MICHAEL VAN HOOK, STEVEN ARMENTA, JAMES GLADDEN, MIR NAWAZ KARIM, JASON DRIVER, SOUTHERN CALIFORNIA HOSPITAL, PROSPECT MEDICAL HOLDINGS, INC., PROSPECT MEDICAL GROUP, MICHAEL TOLWIN, TOLWIN PSYCHIATRIC MEDICAL GROUP, INC., SAMUEL LEE, LEONARD GREEN & PARTNERS, LISA KAHN, JONATHAN REITMAN, MARAT SHPOLYANSKY, THE CITY OF SANTA MONICA, CALIFORNIA, KENNETH SEMKO, GLEAM DAVIS, TERRY O'DAY, TONY VAZQUEZ, KEVIN MCKEOWN, SUE HIMMELRICH, TED WINTERER, AMERICAN YOUTH HOSTELS, INC., HOSTELLING INTERNATIONAL,  KIMBERLY TURNER, JOINTLY AND SEVERALLY**

148. The preceding paragraphs are incorporated herein, as if fully set forth at length.

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

149. All named Defendants' conduct was outrageous; all Defendants, individually or vicariously, intended to cause Plaintiff emotional distress or all Defendants, individually or vicariously, acted with reckless disregard of the probability that Plaintiff would suffer emotional distress, knowing that Plaintiff was present when the conduct occurred; that Jonathan VanLoan suffered severe emotional distress; and that all Defendants' conduct, individually or vicariously, was a substantial factor in causing Jonathan VanLoan's severe emotional distress.

**COUNT FIVE - INVASION OF PRIVACY - AS AGAINST THE CITY OF TORRANCE, CALIFORNIA, EVE IRVINE, TYRONE GRIBBEN, BRIAN MCGEE, PATRICK SULLIVAN, PATRICK FUREY, GEORGE CHEN, TIM GOODRICH, MIKE GRIFFITHS, MILTON HERRING, AURELIO MATTUCCI, GEOFF RIZZO, LOUIS FARRAKHAN, TONY MUHAMMAD, THE NATION OF ISLAM, DOE DEFENDANTS 1-10, PROVIDENCE HEALTH & SERVICES, RODNEY F. HOCHMAN,GARRY OLNEY, RICHARD GLIMP, M.D., THE CITY OF CULVER CITY, CALIFORNIA, THOMAS SMALL, MEGHAN SAHLI-WELLS, GORAN ERIKSSON, SCOTT BIXBY, RYAN THOMPSON, MICHAEL VAN HOOK, STEVEN ARMENTA, JAMES GLADDEN, MIR NAWAZ KARIM, JASON DRIVER, SOUTHERN CALIFORNIA HOSPITAL, SEAN FOWLER, MICHAEL KLEPIN, PROSPECT MEDICAL HOLDINGS, INC., PROSPECT MEDICAL GROUP, SAMUEL LEE, LEONARD GREEN & PARTNERS, MICHAEL TOLWIN, TOLWIN PSYCHIATRIC MEDICAL GROUP, INC. LISA KAHN, JONATHAN REITMAN, MARAT SHPOLYANSKY, THE CITY OF SANTA MONICA, CALIFORNIA, KENNETH SEMKO, GLEAM DAVIS, TERRY O'DAY, TONY VAZQUEZ, KEVIN MCKEOWN, SUE HIMMELRICH, TED WINTERER, AMERICAN YOUTH HOSTELS, INC., HOSTELLING INTERNATIONAL, KIMBERLY TURNER, JOINTLY AND SEVERALLY**

150. The preceding paragraphs are incorporated herein, as if fully set forth at length.

151. Plaintiff had a reasonable expectation of privacy in all of the locations described in this Complaint, either in public places, hospitals, youth hostels,

residences, in his private communications, etc.; all Defendants, individually or vicariously, intentionally intruded into those expectations of privacy in the places described herein; all Defendants' intentional intrusions would be highly offensive to a reasonable person; and Jonathan VanLoan was harmed; and all Defendants' conduct was a substantial factor in causing Jonathan VanLoan's harm.

**COUNT SIX  - NEGLIGENCE - AS AGAINST THE CITY OF TORRANCE, CALIFORNIA, EVE IRVINE, TYRONE GRIBBEN, BRIAN MCGEE, PATRICK SULLIVAN, PATRICK FUREY, GEORGE CHEN, TIM GOODRICH, MIKE GRIFFITHS, MILTON HERRING, AURELIO MATTUCCI, GEOFF RIZZO, LOUIS FARRAKHAN, TONY MUHAMMAD, THE NATION OF ISLAM, DOE DEFENDANTS 1-10, PROVIDENCE HEALTH & SERVICES, LITTLE COMPANY OF MARRY MEDICAL CENTER TORRANCE, RODNEY F. HOCHMAN, GARRY OLNEY, RICHARD GLIMP, M.D.,  THE CITY OF CULVER CITY, CALIFORNIA, THOMAS SMALL, MEGHAN SAHLI-WELLS, GORAN ERIKSSON, SCOTT BIXBY, RYAN THOMPSON, MICHAEL VAN HOOK, STEVEN ARMENTA, JAMES GLADDEN, MIR NAWAZ KARIM, JASON DRIVER, SOUTHERN CALIFORNIA HOSPITAL,  SEAN FOWLER, MICHAEL KLEPIN, PROSPECT MEDICAL HOLDINGS, INC., PROSEPCT MEDICAL GROUP, SAMUEL LEE, LEONARD GREEN & PARTNERS, LISA KAHN, JONATHAN REITMAN, MARAT SHPOLYANSKY, MICHAEL TOLWIN, TOLWIN PSYCHIATRIC MEDICAL GROUP, INC., THE CITY OF SANTA MONICA, CALIFORNIA, KENNETH SEMKO, GLEAM DAVIS, TERRY O'DAY, TONY VAZQUEZ, KEVIN MCKEOWN, SUE HIMMELRICH, TED WINTERER, AMERICAN YOUTH HOSTELS, INC., HOSTELLING INTERNATIONAL,  KIMBERLY TURNER, JOINTLY AND SEVERALLY**

152. The preceding paragraphs are incorporated herein, as if fully set forth at length.

153. All Defendants, individually or vicariously, owed specific duties to Plaintiff, and breached those duties, therefore were negligent; and Jonathan VanLoan as described herein was egregiously harmed; and all Defendants' negligent conduct, individually or vicariously, was a substantial factor in Plaintiff's harm.

**COUNT SEVEN- VIOLATION OF CIVIL RIGHTS-42 U.S.C. § 1983- ( DEPRIVATION OF LIFE, LIBERTY, SAFETY, SPEECH, DUE PROCESS, UNREASONABLE SEIZURE, FREEDOM OF RELIGION) – AS AGAINST TYRONE GRIBBEN, BRIAN MCGEE, STEVEN ARMENTA, JAMES GLADDEN, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES,  MIR NAWAZ KARIM, MARAT SHPOLYANSKY, LISA KAHN, DOES 1-10**

154. The preceding paragraphs are incorporated herein, as if fully set forth at length.

155. All named Defendants intentionally deprived Plaintiff, a white male Christian, of his U.S. Constitutionally protected rights of life, liberty, safety, speech, due process, and unreasonable seizure; and all named Defendants were acting or purporting to act in their official and individual capacities and under color of state law; and Plaintiff Jonathan VanLoan was  severely harmed, and all named Defendants' conduct was the primary cause of Plaintiff's injuries and severe harms. Private Defendants were conspiring and acting with the local Police to murder Plaintiff, therefore exposing them to liability under this law.

**COUNT EIGHT – VIOLATIONS OF 42 U.S.C. § 1983 (DEPRIVATION OF LIFE, LIBERTY, SAFETY, SPEECH, DUE PROCESS, UNREASONABLE SEIZURE, FREEDOM OF RELIGION)  – AS AGAINST EVE IRVINE, SCOTT BIXBY, AND KENNETH SEMKO – SUPERVISORY LIABILITY FOR DEPRIVAVATION OF CIVIL RIGHTS BY POLICE OFFICERS ACTING UNDER COLOR OF STATE LAW**

156. Paragraphs 1- are incorporated herein as if fully set forth at length.

157. The pattern and practice of Police Officers conspiring with the Nation of Islam to murder Plaintiff began in Santa Monica, CA in December 0f 2013, and in Los Angeles, CA in January 2014, with the knowledge and approval of then Chief Charles L. Beck. Police Officers have conspired with the Black Muslims to murder

Plaintiff, and to deprive him of his Constitutional rights in the following municipalities since that time-Los Angeles, Redding, Albuquerque, Santa Fe, Tucson, Torrance, Culver City and Santa Monica, CA.

158. It is unrealistic to assume this widespread infiltration of Police Departments in the Southwest by the Nation of Islam has occurred without the express or tacit approval of the Chiefs in these municipalities, which is a disgrace, and criminal.

159. Plaintiff complained vociferously in Los Angeles to the L.A. Police Commission and Officer of the Inspector General during 2014, while the L.A.P.D. were conspiring with the Black Muslims to murder him without any result. All his protestations fell completely on deaf ears.

160. The same thing happened in this case, when after the murder attempts with Police complicity and cooperation occurred, and Plaintiff complained loudly to the Chiefs and the municipalities, again, the same thing happened, there was NO response.

161. This is the 3rd federal Complaint filed in the Ninth Circuit by Plaintiff alleging conspiracy and independent acts to commit murder against Plaintiff by the Black Muslims and the local Police – it is time for the Chiefs to be held accountable for their allowing a lawless criminal organization like the Nation of Islam to co-opt police officers, who exist solely on taxpayer money, and allow them to subvert the laws of the United States. Eve Irvine, Scott Bixby, and Kenneth Semko participated

in or directed the violations of Plaintiff's Constitutional rights, or knew of the violations and failed to act to prevent them, therefore they have supervisory liability under 42 U.S.C § 1983.

**COUNT NINE – DEPRIVATION OF CIVIL RIGHTS UNDER 42 U.S.C. (DEPRIVATION OF LIFE, LIBERTY, SAFETY, SPEECH, DUE PROCESS, UNREASONABLE SEIZURE, FREEDOM OF RELIGION) – AS AGAINST THE CITY OF TORRANCE, CA, THE CITY OF CULVER CITY, CA, AND THE CITY OF SANTA MONICA, CA AND THEIR CITY COUNCIL MEMBERS, JOINTLY AND SEVERALLY, LOCAL GOVERNING BODY DEFENDANTS - PATRICK FUREY, GEORGE CHEN, TIM GOODRICH, MIKE GRIFFITHS, MILTON HERRING, AURELIO MATTUCCI, GEOFF RIZZO, AND TORRANCE CITY ATTORNEY PATRICK SULLIVAN, THOMAS SMALL, MEGHAN SAHLI-WELLS, GORAN ERIKSSON, GLEAM DAVIS, TERRY O'DAY, TONY VAZQUEZ, KEVIN MCKEOWN, SUE HIMMELRICH, AND TED WINTERER-MUNICIPAL CUSTOM**

162. The preceding paragraphs are incorporated herein, as if fully set forth at length.

163. As stated previously, all the Municipalities that have conspired with the Nation of Islam in the Southwest to murder Plaintiff have all shared that same goal, without any accountability  for the actions of their police officers.

164. These Municipalities have worked together to murder Plaintiff, depending on in which Municipality Plaintiff was in, at the time the multiple attempts (in excess now of 10 attempts over the last five years) occurred.

165. There has been shared communication and shared resources to carry out the wishes of the Nation of Islam in its attempts to murder Plaintiff in at least four states.

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

166. The City Council, jointly and severally, are ultimately responsible for the conduct of their police departments and officers.

167. It must be said that there is now a permanent and well settled practice in the Southwest to allow local police officers to aid and abet the Nation of Islam to attempt to murder Plaintiff, and deprive him of his Constitutional rights.

168. The named City Council Member Defendants, jointly and severally, are ultimately responsible for the actions of their Police Officers in depriving Plaintiff of his Constitutional rights, as the practice has now become a custom in police departments in the Southwest, including in the Municipalities named in this Complaint, to deprive Plaintiff of his Constitutionally protected rights.

169. These City Council Member Defendants, jointly and severally, cannot say that they did not know about the custom of their police departments violating Plaintiff's rights and conspiring with the Black Muslims to murder him, because PLAINTIFF TOLD THEM.

170. These City Council Members, if they did not know, can adduce evidence of their lack of knowledge at trial.

**COUNT TEN – STATE CREATED DANGER – AS AGAINST THE CITY OF TORRANCE, CA, THE CITY OF CULVER CITY, CA AND THE CITY OF SANTA MONICA, CA, EVE IRVINE, SCOTT BIXBY, KENNETH SEMKO, STEVEN ARMENTA, JAMES GLADDEN, TYRONE GRIBBEN, BRIAN MCGEE, RYAN THOMPSON, MICHAEL VANHOOK**

171. The preceding paragraphs are incorporated herein, as if fully set forth at length.

172. By conspiring with the Nation of Islam to murder Plaintiff, and attempting to murder Plaintiff, all named Defendants have acted, or failed to act, and created severe and life- threatening dangers for Plaintiff, wherein he could have died.

173. All named Defendants knew or had reason to know that their conduct would create life-threatening dangers for Plaintiff. In fact, the intent of their conduct and complicity with the Nation of Islam was to murder Plaintiff as a favor to the Nation of Islam. By not protecting and rescuing Plaintiff they created a severe danger to Plaintiff's life.

174. Plaintiff would not have suffered these grave dangers, if the named Defendants had not acted, or had not failed to act, in ways that created very severe dangers for Plaintiff.

175. Plaintiff was egregiously injured as the result of these state created dangers.

## PUNITIVE DAMAGES – AS AGAINST ALL INDIVIDUAL AND CORPORATE AND ENTITY DEFENDANTS, JOINTLY AND SEVERALLY

176. The preceding paragraphs are incorporated herein, as if fully set forth at length.

177. All named Defendants acted with malice, and intent to cause injury; Defendants' conduct was done with a willful and knowing disregard of the rights and safety of Plaintiff; Defendants were aware of the probable dangerous consequences of their actions, and deliberately failed to avoid those consequences.

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

178. All named Defendants' conduct was despicable, and subjected Jonathan VanLoan to cruel and unjust hardship in knowing disregard of his rights. All Defendants' conduct was so vile, base, and contemptible that it is looked down upon and despised by normal, reasonable people.

179. Such conduct warrants the imposition of an award of punitive damages.

## CIVIL CONSPIRACY – AS AGAINST ALL DEFENDANTS

180. The preceding paragraphs are incorporated herein, as if fully set forth at length.

181. By committing all the tortious acts described in this Complaint, all Defendants conspired either before the acts were committed, or after the acts were committed, by attempting to murder Plaintiff, and/or by refusing to investigate Plaintiff's accusations of a conspiracy to murder Plaintiff, and the attempted murders of Plaintiff, and have thereby agreed to accomplish an unlawful purpose, or to accomplish a lawful object by an unlawful means, causing Plaintiff enormous damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this District Court award him:

a.   Compensatory damages in an amount to be determined at trial,

b.   Punitive damages in an amount to be determined at trial, and

c.   A permanent injunction, to prevent irreparable harm to Plaintiff, against the Nation of Islam, and all other Defendants who conspired and acted to cause harm to

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

1   Plaintiff, prohibiting them from attempting to surveil, intimidate, harass, harm or

2   otherwise murder Plaintiff, anywhere in the United States of America.

3

4    Respectfully Submitted,

5   /s/Jonathan Ambrose VanLoan

6   Jonathan Ambrose VanLoan
    In Propria Persona

7   902 North 4th Avenue

8   Tucson, AZ 85705
    424.280.6807

9   9thcircuitplaintiff@gmail.com

10  Dated: January 9, 2019

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

